JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOSEPH ROTHMAN

**DEFENDANTS**

THE VANGUARD GROUP, INC.

**(b)** County of Residence of First Listed Plaintiff   Maricopa County, AZ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Patricia V. Pierce and Michael P. Broadhurst
Weir Greenblatt Pierce, 1339 Chestnut St, Suite 500
Philadelphia, PA 19107     ph. 215-665-8181

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       Another District
       *(specify)*

☐ 6  Multidistrict
       Litigation -
       Transfer

☐ 8  Multidistrict
       Litigation -
       Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 626(c); Title VII, 42 U.S.C. §§ 2000e-2, 2000e-5(f)(1) and (3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a

Brief description of cause:
Age, Gender and Religious descrimination

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
in excess of $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
Mar 31, 2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 6230 E. Via Estrella Avenue Scottsdale, AZ 85253 _____

Address of Defendant: _____ 100 Vanguard Boulevard Malvern, PA 19355 _____

Place of Accident, Incident or Transaction: _____ 100 Vanguard Boulevard Malvern, PA 19355 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 03/31/2023     _____     23129
                               *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**   *Federal Question Cases:*

☐   1.   Indemnity Contract, Marine Contract, and All Other Contracts
☐   2.   FELA
☐   3.   Jones Act-Personal Injury
☐   4.   Antitrust
☐   5.   Patent
☐   6.   Labor-Management Relations
☐   7.   Civil Rights
☐   8.   Habeas Corpus
☐   9.   Securities Act(s) Cases
☐   10.   Social Security Review Cases
☑   11.   All other Federal Question Cases
       *(Please specify):* _____ ADEA, Title VII _____

**B.**   *Diversity Jurisdiction Cases:*

☐   1.   Insurance Contract and Other Contracts
☐   2.   Airplane Personal Injury
☐   3.   Assault, Defamation
☐   4.   Marine Personal Injury
☐   5.   Motor Vehicle Personal Injury
☐   6.   Other Personal Injury *(Please specify):* _____
☐   7.   Products Liability
☐   8.   Products Liability – Asbestos
☐   9.   All other Diversity Cases
       *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ PATRICIA V. PIERCE _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑   Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐   Relief other than monetary damages is sought.

DATE: 03/31/2023     _____     23129
                               *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH ROTHMAN | : | |
| 6230 E. Via Estrella Avenue | : | CIVIL ACTION |
| Scottsdale, AZ 85253 | : | |
| | : | CASE NO. |
| Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| THE VANGUARD GROUP, INC. | : | |
| 100 Vanguard Boulevard | : | |
| Malvern, PA 19355 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>COMPLAINT</u>

Plaintiff Joseph Rothman ("Rothman"), by and through his undersigned counsel, brings this civil action against Defendant The Vanguard Group, Inc. ("Vanguard") and avers:

## <u>PRELIMINARY STATEMENT</u>

Through seventeen years in its Municipal Credit Research group, Joseph Rothman demonstrated outstanding analytical skills and business acumen, continually delivering for his employer. According to a direct supervisor, Rothman's work performance was "excellent," he had "strong analytical skills," was "confident in making judgment calls", was "exceptionally good at mentoring young people," "was very good at teaching," and got along well with colleagues and contacts outside Vanguard. Senior management recognized Rothman as a "go to" person in Municipal Credit Research, a department dedicated to analyzing and recommending investment opportunities. Based on his record of sustained, superior performance, in 2017 Vanguard selected Rothman to add depth to Vanguard's Municipal Credit Research group in its Arizona office.

Taking this opportunity, Rothman uprooted his family from suburban Philadelphia where they had a strong community within which to practice their Jewish faith and moved to Arizona.

However, from the outset of his employment at Vanguard, others were uncomfortable with Rothman. Ruth Levine, the manager who hired Rothman, is also Jewish and experienced antisemitism in the company first-hand. Levine was concerned that Rothman's regular practice of his Jewish faith, including observance of the Jewish Sabbath beginning on Friday at sundown and holidays, would be used as a basis to criticize Rothman's performance. Levine instructed Rothman to take steps to protect himself. While Rothman took that advice, Vanguard's corporate culture is dominated by white middle-class Gentile men. A clear demonstration of this dominance occurred when, in order to curry favor, a female Vanguard Principal[1] declared during a meeting that she considered Shakespeare's character Shylock to be her "role model." Although witnessed by multiple Vanguard Principals and the head of Human Resources, this antisemitic remark was never addressed. According to Levine, others at Vanguard viewed Rothman as "too New York", which she has said was code for too Jewish. Levine also said that the discomfort had nothing to do with Rothman's job performance but arose from his perceived "New York" (Jewish)-ness.

After Levine retired and Rothman transferred to Arizona, Vanguard changed how it treated Rothman. Passing over Rothman, Vanguard promoted younger, less qualified individuals to supervise him. One new manager, David Thorkelson who is significantly younger than Rothman said it was "weird" and "awkward" that he would supervise Rothman since Rothman had superior expertise and had been with Vanguard far longer. When discussing the relocation to Arizona and sharing that he was pleased to find a home within walking distance to a synagogue so he could attend services, another Vanguard Principal, Ron Mintz, responded "So, you're still doing the Jewy

---

[1] On information and belief, Vanguard Principals are the most senior level managers in the organization. Very few Vanguard employees are promoted to the Principal level.

stuff?" When Rothman told Thorkelson about Mintz's remark, Thorkelson discouraged Rothman from informing Human Resources or others in management saying that he "would not take that anywhere." Soon thereafter, another younger and less knowledgeable supervisor, Nathan Will, used Rothman's age to critique his performance, saying he "fired on only two cylinders" while younger, female analysts "fired on five" and demanded that Rothman provide information that Will could give to his supervisor to "make him (Will) look good." At the same time, Will criticized Rothman for failing to take part in evaluating certain investment opportunities despite the fact that Rothman had been excluded from taking part in evaluating those opportunities while younger, female colleagues were invited to do so.

In early March 2022, Vanguard seized on a brief interaction Rothman had with a younger, female colleague, Molly Bordeaux, over scheduling a meeting. Vanguard suspended Rothman, ordered him not to return to the office, and initiated an investigation. Rather than investigate the exchange between Rothman and Bordeaux and, indeed, without focusing on his younger, female colleague's behavior at all, Vanguard conducted what another Vanguard employee called a "witch hunt." Vanguard interviewed employees who were not involved with the incident and kept Rothman in the dark about the substance and purpose of its inquiries. After a two-week suspension, without warning or engaging Rothman in a progressive discipline process of any kind and without referring his younger, female colleague for discipline at all, Vanguard terminated Rothman's employment. In his shock and disbelief, Rothman asked Vanguard Employee Relations Director Steve McCord what he had done that merited termination. McCord responded only that Rothman "broke policy." Only after Rothman followed up by email asking for a copy of Vanguard policies that justified the immediate termination of his employment did McCord claim, a week later, that Rothman's "behavior was found to be in violation of Vanguard's Professional Conduct Policy and

inconsistent with its Fair Treatment Policy." However, McCord refused to send a copy of either policy or allow him to see his personnel file.

In fact, Vanguard's termination of Joseph Rothman's employment was motivated by its unlawful biases against him grounded in his age, gender, and Jewish faith. Confirming one aspect of Vanguard's unlawful bias against him, Rothman's supervisor, Nathan Will, explained Rothman's sudden departure by telling others that Rothman had "retired" despite the fact that Rothman was just fifty-seven (57) years old and planned to continue working there for another ten (10) years. As it showed him the door after seventeen years of outstanding work, Vanguard never consulted Rothman about using this cover story and never offered him the chance to take advantage of any retirement benefit.

Since that time, Rothman repeatedly tried to engage Vanguard about its decision asking for an explanation of what he did that might merit termination, but Vanguard has failed to produce any information from its so-called "investigation" that might be a legitimate basis for this action.

Vanguard's discriminatory actions have inflicted immense financial and other harms on Rothman. Based on his record with Vanguard, Rothman had earned a comfortable living and planned to retire from Vanguard in another ten years or so. Those plans changed abruptly when Vanguard fired him, and Rothman has been grappling with the consequences ever since. Vanguard forced Rothman into a challenging job market where he has had to explain why, as a fifty-seven-year-old man with his background and experience, he had to seek new employment. Rothman has been unable to get a new job paying an equivalent salary, similar benefits and/or retirement opportunities.

Accordingly, Joseph Rothman has been forced to bring this action to obtain redress for the unlawful discrimination inflicted on him by Vanguard, which culminated in its unlawful termination of his employment.

## PARTIES

1.      Plaintiff Joseph Rothman is an individual, currently residing at 6230 E. Via Estrella Avenue, Scottsdale, Arizona 85253.

2.      Rothman was born January 11, 1965 and is currently fifty-eight (58) years old.

3.      Defendant, the Vanguard Group, Inc., is Pennsylvania corporation with its principal place of business at 100 Vanguard Boulevard, Malvern, Pennsylvania 19355.

4.      Vanguard holds itself out as "one of the world's most respected investment management companies, offering a broad selection of investments, advice, retirement services, and insights to individual investors, institutions, and financial professionals."[2]

5.      At all times material to this action, Vanguard was an employer within the meaning of the federal statutes that form the basis of this action.[3]

6.      Vanguard is engaged in an industry affecting interstate commerce and, upon information and belief, employs approximately 18,800 individuals.

7.      At all times material to this action, Vanguard acted by and through authorized agents, servants, contractors, and/or employees acting with the course and scope of their employment with Vanguard and in furtherance of Vanguard's business.

---

[2] The Vanguard Group, Inc., *Who We Are: Vanguard at a Glance – Facts and Figures*, available at: https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/facts-and-figures.html (last visited January 3, 2023).

[3] Rothman filed claims with both the United States Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. However, Rothman is still awaiting the PHRC's issuance of a Notice of Right to Sue. Once such a Notice has issued, Rothman intends to amend this Complaint to include causes of action under the Pennsylvania Human Relations Act, in addition to federal statutes.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.

9.      Rothman's age discrimination claims under federal law are authorized and instituted pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 626(c) (the "ADEA").

10.     Rothman's gender and religious discrimination claims under federal law are authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e-2, 2000e-5(f)(1) and (3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

11.     This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) in that Rothman is a citizen of the State of Arizona, Vanguard is a Pennsylvania entity having its principal place of business in Malvern, Chester County, Pennsylvania, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

12.     Venue is proper in this district under 28 U.S.C. §1391(b) in that Vanguard is resident in this district within the meaning of 28 U.S.C. § 1391(c) having its principal place of business in Malvern, Chester County, Pennsylvania, where a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred.

13.     Upon information and belief, the decisions regarding Rothman's employment were made at Vanguard's principal place of business in Malvern, Chester County, Pennsylvania by decision-makers working and living in this District. In addition, Vanguard's records pertaining to Rothman's employment are maintained and administered in this judicial district.

14.     On or about September 12, 2022, Rothman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Attached hereto and incorporated herein and marked as Exhibit A is a true and correct copy of the Charge (for purposes of electronic filing, minor portions have been redacted to protect confidential information).

15.     On or about October 6, 2022, in response to Rothman's request, the EEOC issued a Notice of Right to Sue. Attached hereto and incorporated herein and marked as Exhibit B is a true and correct copy of the Notice.

16.     Thus, Rothman has exhausted his administrative remedies in connection with his claims under federal law and may appropriately commence this action in the District Court. The parties entered into a tolling agreement under which the time for filing a complaint was extended to April 3, 2023.

## FACTUAL BACKGROUND

### ROTHMAN DELIVERS EXCELLENT PERFORMANCE DESPITE DISCOMFORT WITH HIM DUE TO BEING "NEW YORK"

17.     Rothman joined Vanguard in 2005 after having achieved substantial success for nearly two decades while working at Sumitomo Bank and Moody's Investors Service.

18.     He moved from New York to Pennsylvania to work at Vanguard's headquarters in Malvern, Chester County, Pennsylvania.

19.     Rothman and his family searched for and found a community in suburban Philadelphia within which to practice their Jewish faith, which is very important to them.

20.     Vanguard employed Rothman as a Senior Analyst in its Municipal Credit Research group, which is dedicated to analyzing and recommending investment opportunities.

21.     Rothman covered the analysis of general obligation financing, corporate credit, project finance, and healthcare finance. Rothman focused on healthcare finance, a challenging and

high-risk area. Acknowledging his superior skill and his experience, his supervisors assigned credit risks requiring greater scrutiny to Rothman.

22.     Over the course of nearly seventeen (17) years with Vanguard, Rothman delivered excellent performance for Vanguard and its investors.

23.     His supervisors, such as Ruth Levine, Principal, Head of Municipal Credit Research, and former Senior Municipal Credit Analyst, considered Rothman a "go to" person on an array of credit questions based on his analytical skills and business acumen, and evaluated his work performance "excellent" and "superior." According to Levine, Rothman had strong analytical skills and had the ability to correctly evaluate both short- and long-range investment opportunities. Levine has said that Rothman was confident in and comfortable making important judgment calls.

24.     Levine also considered Rothman to be exceptionally good at mentoring younger people due to his patience and his skill at teaching. As a result, Rothman helped others in his sphere progress.

25.     Rothman was able to work well and get along with colleagues within Vanguard and contacts outside Vanguard, according to Levine.

26.     However, a number of people at Vanguard had discomfort with Rothman because they viewed him as being "too New York." According to Levine, the description of being "too New York" is code for Jewish.[4]

27.     The discomfort others at Vanguard had with Rothman had nothing to do with his job performance but was based on his presentation and his "New York"-ness.

---

[4] The use of "New York" as code for Jewish is common, as seen in modern expression "Jew York" a "clever name for the state or city of New York used as a dig on the Jews, due to its exceptionally large Jewish population. *See* Urban Dictionary, *Jew York*, available at: https://www.urbandictionary.com/define.php?term=Jew+York (last visited March 31, 2023).

28.     Based on the corporate culture of Vanguard, at the time that Levine interviewed and hired Rothman, she was concerned that the fact he regularly observed his Jewish faith would be a problem for him.

29.     When hiring Rothman in 2005, Levine recognized that Rothman's observance of his faith might be a problem for him at Vanguard and she remained concerned that Rothman's religious observance would be used as a basis to evaluate his performance.

30.     Levine was so concerned that Rothman's regular observance of his faith which included leaving the Vanguard offices early on Fridays and before religious holidays in order to attend services at his synagogue would be used as a basis to criticize his performance.

31.     She therefore instructed Rothman to keep records of his time working so that he could respond to criticisms that he was not working enough, something other employees did not need to do.

32.     Rothman complied with Levine's instruction and kept these records.

33.     Rothman also worked on Sundays, when necessary, to avoid giving any basis for criticisms that he was not working a sufficient number of hours.

34.     After Levine offered Rothman the position with Vanguard which required moving to Pennsylvania, Rothman told Levine that he and his wife had submitted an offer on a home in Pennsylvania that was within walking distance to a synagogue, a factor that she understood was important to them.

35.     Upon hearing this from Rothman, Levine immediately went to her supervisor and informed him that she would tell Rothman not to buy the house if Vanguard would turn around and fire him within a brief period. Her supervisor assured her that would not happen.

<u>VANGUARD'S WHITE, MIDDLE-CLASS GENTILE CULTURE</u>

36.     However, even after Rothman remained employed at Vanguard past the first few months, based on her experience there Levine remained concerned at a gut level about how Rothman was viewed in the organization where white, middle-class Gentile males were predominant.

37.     In 2013 or 2014, Levine attended an off-site meeting of Vanguard Principals[5] at which a diversity presentation took place using the work of William Shakespeare as a point of discussion.

38.     During the discussion among all the Vanguard Principals present, one participant made a statement that she considered the character Shylock from Shakespeare's play *The Merchant of Venice* to be her "role model."

39.     Levine found the statement to be derogatory to Jews and offensive.

40.     All of Vanguard's senior leadership were present in the room and heard the comment, including the then long-term head of Human Resources. No one in Vanguard's leadership objected to the remark.

41.     Out of fear of repercussions for her own employment and career at Vanguard, Levine did not immediately object, but did complain in an evaluation of the meeting.

42.     However, there was no response to her complaint.

43.     At a subsequent meeting regarding diversity in the workplace, Levine spoke with the head of Human Resources about the comment referring to Shylock as a "role model," the fact that no one in leadership objected, and the fact that no one responded to her complaint.

---

[5] On information and belief, Vanguard Principals are the most senior level managers in the organization. Very few Vanguard employees are promoted to the Principal level.

44.     The then head of Human Resources responded that despite being present when the remark was made, she did not think it was her responsibility to address the remark and that the outside facilitator should have said something.

### DESPITE ITS CULTURE, VANGUARD RECOGNIZED AND EXPLOITED ROTHMAN'S ABILITIES

45.     Despite this culture, some among Vanguard leadership recognized Rothman's skills, business acumen, and leadership. This included Greg Davis, Managing Director and Chief Investment Officer and one of only a few African Americans in upper management at Vanguard,

46.     On that basis and recognizing the value that Rothman contributed, Vanguard asked Rothman to take a position in its new Arizona office to help grow its Municipal Credit Research group and to train and mentor other Vanguard analysts, many of whom were younger and female.

47.     Rothman accepted the opportunity to continue his career growth with Vanguard and in 2017, he uprooted his family again and moved to Arizona.

48.     As a professional, Rothman has always been driven to succeed and found his work exciting and fulfilling. He approached his roles with a keen sense of fiduciary duty and candor.

49.     Rothman also regularly mentored, taught, and supported his colleagues including the younger and female employees in the Municipal Credit Research group.

50.     Vanguard management often referred to Rothman as a "team lead" but Vanguard never promoted him to management or gave him a formal supervisory role.

51.     However, his managers required that he continue to instruct and coach his younger and female colleagues in Municipal Credit Research.

52.     Until Vanguard promoted younger and less-qualified individuals to supervise him, reviews of Rothman's performance were all positive and, when he did receive critical feedback, he responded constructively.

53.     Until the events leading to his termination, Vanguard had not directed any employment discipline toward Rothman.

54.     With his experience and relationships, Rothman also identified new business opportunities for Vanguard, including the company's participation in the "private placement" of investments.

55.     Rothman identified that Vanguard could take part in the "private placement" of investments and worked with his contacts in the healthcare finance industry to make successful investments.

56.     However, having developed the concept and having shared it with others in the company, others in the company then excluded Rothman from further private placement opportunities.

57.     Based on his experience and performance at Vanguard, Rothman had every reason to expect that he would work there until his planned retirement around age 67.

58.     Shortly after relocating to Arizona – a move that supposedly recognized his value to the company, Rothman spoke about the relocation with Ron Mintz, a Vanguard Principal, a senior Vanguard manager. Mintz asked Rothman about his living arrangements to which Rothman responded how he was pleased that he found a home within walking distance to a synagogue. Mintz responded "So, you're still doing the Jewy stuff!"

59.     Rothman felt that this remark was denigrating to his faith and his practice.

60.     Rothman reported Mintz's statement to his manager, David Thorkelson. But Thorkelson dismissed the remark and told Rothman that he "would not take that anywhere."

61.     Instead, Thorkelson told Rothman not to report the remark to Human Resources or others in management.

62.     Despite finding the statement offensive and objectionable, Rothman did not report the statement further because he was concerned that doing so might negatively impact his career at Vanguard.

DESPITE HIS PERFORMANCE, VANGUARD DISCRIMINATED AGAINST<br>ROTHMAN AND PROMOTED YOUNGER, LESS-QUALIFIED INDIVIDUALS TO<br>OVERSEE ROTHMAN, INDIVIDUALS WHO THEN DISCRIMINATED AGAINST<br>HIM BASED ON HIS AGE, GENDER AND JEWISH FAITH

63.     Regrettably, Vanguard did not reward the excellent performance, dedication, and good will Rothman demonstrated and, instead, subjected Rothman to discrimination based on his age, gender, and Jewish faith.

64.     Not long after Rothman moved to Arizona in 2017, Vanguard passed him over for promotion and installed two younger, less experienced, and less qualified individuals as his supervisors: Nathan Will  and David Thorkelson.

65.     Will came to the Municipal Credit group from Vanguard's legal department and had no meaningful background in municipal financial research or analysis.

66.     According to Levine, while she worked with him, Will displayed no interest in learning about municipal financial analysis either.

67.     Will was only interested in legal issues regarding investments, not in fundamentals.

68.     Will was not on a level with Rothman or the work that Rothman did.

69.     However, as a person, Will was consistent with the upper-middle class white Gentile culture at Vanguard and it became obvious that Will would become head of Municipal Credit Research after Griffin retired because Will looked and talked like the other white males in management.

70.     Thorkelson had no prior experience at Vanguard.

71.     In his first meeting with Thorkelson after he was named Rothman's direct

13

supervisor, Thorkelson told Rothman that it was "weird" and that he felt "awkward" being made his manager given Rothman's seniority and expertise in the area of municipal credit.

72.   As a dedicated professional, Rothman responded that he was "there to make the relationship work and to add value" for Vanguard's investors and shareholders.

73.   From that point forward, Thorkelson and Rothman had only occasional meetings, over cell phones, and Thorkelson did not actively manage him.

74.   Both Will and Thorkelson are substantially younger than Rothman (12-15 years).

75.   When Will became Rothman's supervisor, Will reduced communication with Rothman which was a substantial change from the interactions Rothman had with Levine and his other supervisors such as Mike Griffin.

76.   At his first performance review after Will was named as Rothman's supervisor, Will rated Rothman's performance "Off Course," a rating that no previous supervisor had ever given him. After a concerted effort on Rothman's part, however, by the end of the year Rothman earned a "Fully Successful" rating.

77.   This conduct, as well as comments by colleagues, caused Rothman to feel that he needed to watch his back, that Will was gunning for him, and that Will had taken Rothman "out of the loop" in the Municipal Credit Research group.

### VANGUARD FAVORED YOUNGER, FEMALE, AND/OR NON-JEWISH CO-WORKERS WHILE TAKING FULL ADVANTAGE OF ROTHMAN

78.   Vanguard management took full advantage of Rothman's extensive experience and expertise while leaving Rothman in a subordinate place in the management and reporting structure. At the same time, Vanguard offered younger, female, and/or non-Jewish co-workers opportunities and rapid promotions.

79.   In addition to promoting Will and Thorkelson rather than promoting Rothman,

around the same time, other, younger and/or female employees such as Kelly Gosselin, Erin Kelly, Ellen Cannarsa, Jake Enderes, and/or Molly Bordeaux were advanced in pay grade, responsibility, and/or promoted despite not having comparable experience or expertise and/or assignments that were as complex or demanding as the work assigned to Rothman.

80.     For example, Bordeaux was promoted twice in under two years in the first three years of working at Vanguard as demonstrated by her LinkedIn profile.[6]

81.     As his supervisor, Ruth Levine observed, Rothman was exceptionally good at mentoring younger people. In addition to having patience, Rothman was very good at teaching, and helped people progress.

82.     Indeed, Vanguard transferred Rothman to Arizona so he could train, mentor, and grow the Municipal Credit Department.

83.     Because he enjoyed teaching and mentoring, Rothman did it well. As a result, Rothman mentored and taught many younger, female, and/or non-Jewish Vanguard employees in issues relating to municipal credit research and analysis.

84.     Among the many Vanguard employees that Rothman mentored were Erin Kelly, Ellen Cannarsa, Molly Bordeaux and Sim Singh, younger and female employees.

85.     Despite its use of his experience and expertise, Vanguard gave Rothman little or no support in addressing challenging interactions with junior team members that Vanguard expected him to develop and mentor or respect for doing so.

86.     At least one younger employee who interacted with Rothman took to calling Rothman "Daddy," a clear reference to his age. B.J. Dornubari called Rothman "Daddy" in the presence of multiple Vanguard colleagues including, but not limited to, John Carbone, Justin

---

[6] *See* LinkedIn, *Molly Bordeaux Gosse, CFA*, https://www.linkedin.com/in/molly-bordeaux-gosse/ (last visited March 20, 2023).

Ferrara, and Molly Bordeaux. Rothman found the term offensive and bothersome.

87.     When Rothman asked his supervisors including David Thorkelson, Nathan Will, and Paul Malloy to take part in meetings or conference calls including weekly team meetings with younger and less-experienced employees, those  supervisors never took part.

88.     Rothman asked Will for support addressing issues that arose with more junior analysts in the group such as individuals who were not strong, could not catch on, and/or who pushed back on guidance. Rather than offer support or counsel, Will instructed Rothman to "deal with it," and to "make sure nobody complains."

89.     Further, Will warned Rothman against seeking help from management above Will with whom Rothman had relationships. Will told Rothman: "And don't think you can go speak to Greg Davis [Vanguard's Managing Director and Chief Investment Officer] and fix it."

90.     Upon information and belief, Will warned Rothman about speaking with Davis because Will was embarrassed that Rothman had a relationship with Davis and had spoken with Davis in the past to seek advice.

91.     Upon information and belief, Rothman's supervisors did not want him to succeed in carrying out the "team lead" responsibilities they assigned him.

### VANGUARD ESCALATES ITS DISPARATE TREATMENT OF ROTHMAN

92.     Although Nathan Will had long been hostile toward Rothman, that antipathy increased further after a team meeting which took place by Zoom in mid-2020 while Vanguard was operating on a remote basis in response to the COVID-19 pandemic. After Will said that team members should not misunderstand if other team members did not respond immediately to emails because everyone should be taking appropriate time for self-care, Rothman responded to the effect that, as professionals, those on the call understood prioritizing responses to emails. Although

Rothman did not intend to offend, Will took offense and spoke about that offense to others, starting a campaign against Rothman.

93.     Despite the fact that he had not spoken in an offensive way and had intended no offense, Rothman apologized to Will. It did not appear to Rothman that Will accepted the apology.

94.     Several months later, while visiting Vanguard's Malvern offices in November 2021, Rothman sought out Will, Thorkelson, and Malloy for in-person, informal meetings before performance reviews for 2021 were finalized.

95.     In their meeting, Will told Rothman that he was the "worst performing analyst" in the department. Shocked by this statement, Rothman asked what made Will say it.

96.     Will answered that Rothman was "firing on two cylinders" while two younger, female analysts (Molly Bordeaux and Sim Singh) "are firing on five."

97.     In addition to the fact that Bordeaux and Singh are women, Rothman understood Will's comment as referring to his age since both Bordeaux and Singh are substantially younger than he is, being in their twenties or thirties.

98.     In this same meeting, Rothman asked for details on what caused Will to conclude that his performance was less than satisfactory, but Will did not supply any facts supporting the statement.

99.     Rothman also asked what he could do to meet Will's expectations to which Will responded, "all I need from you is data that I can give to Paul [Malloy, Vanguard Principal and Head of Municipals] so he can look good in front of Sarah [Devereux]," Global Head of Fixed Income.[7] Both Will and Thorkelson reported to Malloy and to Devereaux.

---

[7] Indeed, once Sarah Devereaux became Global of Fixed Income, Vanguard began focusing on diversity, equity, and inclusion which meant promoting younger and/or female employees even as their qualifications did not match Rothman's and he was left to stagnate.

100.    Will provided no other information or explanation to Rothman.

101.    In the same meeting, Will told Rothman that he had not met a performance goal dealing with participation in private placement offerings of securities.

102.    Rothman had conceived and developed Vanguard's participation in private placements.

103.    As Rothman's supervisor, however, Will influenced access to Municipal Credit Research group employees' participation in analyzing and selecting possible private placement investments made by Vanguard.

104.    Will also made participation in the analysis and selection of possible private placement investments a criterion to assess performance in the group.

105.    However, Will and others excluded Rothman from collaborations on proposed private placements, cutting off Rothman's opportunity to meet performance goals in that area.

106.    Joshua Zalasky, Senior Counsel and Manager with Vanguard, informed Rothman that there were close to twenty private placements that had been considered that Rothman was not given a chance to take part in.

107.    On information and belief, younger, less experienced and less skilled members of the Municipal Credit Research Department were offered the opportunity to participate in private placement opportunities.

108.    In response to Will's comment, Rothman asked Will why he had not been included in discussions on any of those private placements.

109.    Will's only response was that Rothman should "ask [him]self why."

110.    Rothman understood Will's comments to be referring to Will's bias against him, which was age- or gender-based or grounded in the fact that Rothman is Jewish, and that Will did

not want Rothman to meet his goals.

111.   As a direct result of Will excluding Rothman from information and/or opportunities to take part in private placement analysis, Will prevented Rothman from earning compensation and bonuses related to private placement opportunities.

112.   That year, despite Vanguard having one of its best financial performances, Rothman received a substantially lower bonus than he had in prior years. Upon information and belief, this reduction in Rothman's bonus compensation was a result of Vanguard's unlawful bias.

113.   Vanguard's decisions to exclude Rothman from participating in the private placement program he created, while offering opportunities for younger, non-Jewish, less qualified similarly situated employees constituted disparate treatment of Rothman  based on his age and/or his gender and/or his religion.

114.   Vanguard's bias against Rothman based on his age and/or his gender and/or religion directly impacted Rothman's career advancement with Vanguard as well as his compensation.

THE MARCH 3, 2022 INTERACTION AND<br>VANGUARD'S SO-CALLED INVESTIGATION

115.   Following an interaction that took place on or about March 3, 2022 between Rothman, Isaac Solbach, a Senior Associate in Vanguard's Emerging Leadership Development Program, and Molly Bordeaux, a Senior Credit Research Analyst, Vanguard suspended Rothman, barred him from its Arizona office, and launched an "investigation" into his conduct.

116.   The interaction that spurred Vanguard's "investigation" was as follows:

    a.    Toward the end of the day on Thursday, March 3, 2022, as Rothman was preparing to leave for the day, Rothman saw Solbach and spoke with him regarding a project that Solbach had been involved with under Rothman's guidance.

    b.    Although Solbach's rotation in the Municipal Credit group was ending, Rothman and Solbach had not yet spoken about the work that Solbach had done.

      c.     Although neither Rothman nor Solbach addressed any statement to Bordeaux, she interrupted the conversation and said, "Well, Joe, you haven't been around all week!"

      d.     Rothman responded that he had been in the office, that he had been speaking to Solbach, and that Solbach "can speak for himself."

      e.     Turning back to Solbach, Rothman then suggested several alternative times when the two could meet the next day after the team morning meeting, including possibly meeting outside the office.

      f.     Bordeaux again interrupted the discussion and said "You can't do that. You need approvals from management for that."

      g.     Rothman then told Solbach that he did not realize that, and he and Solbach agreed that the two would meet the next morning in the office.

117.    Later that same day, as Rothman left the building, Rothman encountered Solbach in the parking lot outside the office and spoke with him again. Rothman told Solbach that he was sorry that Solbach was "caught in the middle" and then left for the day.

118.    The next day (Friday, March 4, 2022), Rothman went to Vanguard's offices where John Carbone, Vanguard Principal and Arizona site leader, sought Rothman out and instructed Rothman not to speak with Solbach or other associates again.

119.    Rothman asked Carbone whether he had spoken with Bordeaux about the exchange that took place the day before.

120.    Carbone responded that he "didn't want to" but he had spoken with Bordeaux and Solbach.

121.    When Rothman asked Carbone if he wanted to hear Rothman's account of what took place, Carbone  said "No" and ended the conversation.

122.    Rothman complied with Carbone's instructions.

123.    The following Monday, March 7, 2022, when Rothman went to Vanguard's office, Will contacted Rothman, told him that he was aware of the incident and instructed Rothman not to return to the office but to go home, and informed him that Human Resources had started an investigation.

124.    Rothman complied with Will's instruction and did not return to the office.

125.    Rather than engaging in an even-handed investigation of the interaction, however, Vanguard seized on this brief exchange over scheduling as an excuse to interview multiple individuals with whom Rothman had worked over many years who had not been present for and who had not taken part in the incident of March 3, 2022.

126.    Upon information and belief, Vanguard did not investigate or discipline Bordeaux or Solbach for their parts in the March 3, 2022 incident.

127.    Instead, Vanguard used the incident as an excuse to terminate Rothman's employment without warning or other discipline of any kind.

128.    During its so-called investigation, Vanguard provided Rothman with little or no information about what complaint or issue was being investigated or why.

129.    Instead, Vanguard denied Rothman information about the investigation.

130.    Rothman was first contacted about this so-called investigation by telephone on March 10, 2022, when Steven McCord of Vanguard Human Resources asked him a few questions.

131.    In a second interview on March 11, 2022, McCord showed Rothman a surveillance video without any audio in which Rothman can be seen speaking with Solbach in the parking lot outside the Vanguard office.

132.    McCord asked Rothman about the contents of the conversation, and Rothman

responded that Rothman told Solbach that he was sorry that he had been placed in the middle of a situation involving Rothman and Bordeaux.

133.    Despite the fact that the purpose and scope of its investigation remained unclear to him, Rothman fully cooperated with Vanguard's investigation.

134.    While he was barred from coming to the office, Rothman learned that Vanguard Human Resources had gathered statements from other employees, including individuals who were not involved with or present for the exchange that took place on March 3, 2022.

135.    Other Vanguard employees informed Rothman that only select individuals were interviewed about Rothman because management was "going after" Rothman as part of a "witch hunt" and that those (supportive) employees had been  told not to speak with him because Rothman would be suing Vanguard.

136.    Thus, it appears Vanguard reached its decision to terminate Rothman well before completing any review of the incident.

VANGUARD'S UNLAWFUL TERMINATION OF ROTHMAN'S EMPLOYMENT

137.    Without explaining the charges against him or the subject of the investigation so that Rothman could defend himself, on March 22, 2022, McCord and Will called Rothman to announce the results of the so-called investigation.

138.    During that call, Will read a prepared statement and informed Rothman that Vanguard had terminated his employment due to an alleged "breach of policy."

139.    Rothman asked what he had done, and McCord responded, "like we said, you broke policy."

140.    Rothman asked what specific policy he had allegedly breached, and McCord responded that it was a violation of Vanguard policy to invite another employee to meet at his

22

home.

141.    Rothman later asked for a copy of the policy that he had allegedly violated, and that he be allowed to review his personnel file, but McCord refused to provide a copy of the policies or allow Rothman to review his personnel file.

142.    Instead, nearly a week later, McCord claimed that Rothman's "separation was the result of your behavior which was found to be in violation of Vanguard's Professional Conduct Policy and inconsistent with its Fair Treatment Policy" but did not provide copies of the policies themselves.

143.    Upon information and belief, since terminating Rothman's employment, Vanguard has replaced Rothman with and/or assigned his duties to younger and/or female employees.

144.    After terminating Rothman's employment, Will falsely represented that Rothman had "retired" despite the fact that Rothman did not retire and no one at Vanguard sought Rothman's consent or communicated with Rothman about its chosen cover-story or explained any retirement benefits or options available to him.

145.    Vanguard's misrepresentations of the facts further demonstrate its bias against Rothman on the basis of age and demonstrate one of the motivations for its treatment of Rothman.

146.    On information and belief, Vanguard does not conduct investigations into complaints by crew members or officers of discriminatory conduct and/or violations of Vanguard Fair Treatment or Professional Conduct Policies in an even-handed manner. Rather, Vanguard has in the past and did in this case, target individuals for investigation whose managers want to terminate them while at the same time failing or refusing to investigate legitimate and provable claims of discrimination against favored white middleclass male employees.

## COUNT I
### (Violation of the Age Discrimination in Employment Act)

147.    Rothman incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

148.    Vanguard, by the discriminatory acts set forth in the preceding paragraphs of this Complaint, has violated the ADEA.

149.    These violations included, but were not limited to:

  a.    Subjecting Rothman to performance reviews based on his age and not on his performance and decreasing his compensation as a result;

  b.    Depriving Rothman of opportunities to achieve performance goals and/or promotion based on his age;

  c.    Subjecting Rothman to an investigation, suspension, and/or discipline while at the same time failing to investigate, suspend, and/or discipline younger employees involved in the same incident;

  d.    Terminating Rothman's employment because of his age; and/or

  e.    Replacing him and/or assigning his duties to one or more younger employees.

150.    Vanguard's violations were intentional and willful under the circumstances and warrant the imposition of liquidated damages.

151.    As a direct and proximate result of Vanguard's violation of the ADEA, Rothman has sustained the injuries, damages and losses set forth herein.

152.    Rothman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Vanguard's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

**COUNT II**
**(Violation of Title VII of the Civil Rights Act of 1964 - Gender)**

153.   Rothman incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

154.   Vanguard, by the discriminatory acts set forth in the preceding paragraphs of this Complaint, has violated Title VII of the Civil Rights Act of 1964.

155.   These actions include, but are not limited to:

a.   Depriving Rothman of opportunities to achieve performance goals and/or promotion based on his gender;

b.   Subjecting Rothman to an investigation, suspension, and/or discipline while at the same time failing to investigate, suspend, and/or discipline female employees involved in the same incident;

c.   Terminating Rothman's employment because of his gender; and/or;

d.   Replacing him and/or assigning his duties to one or more female employees.

156.   As a direct and proximate result of Vanguard's violations of Title VII, Rothman has sustained the injuries, damages and losses set forth in this Complaint.

157.   Rothman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Vanguard's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

158.   Vanguard's actions were undertaken with malice and/or reckless indifference to Rothman's rights under the circumstances and warrant the imposition of punitive damages.

**COUNT III**
**(Violation of Title VII of the Civil Rights Act of 1964 - Religion)**

159.   Rothman incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

160.    Vanguard, by the discriminatory acts set forth in the preceding paragraphs of this Complaint, has violated Title VII of the Civil Rights Act of 1964.

161.    These actions include, but are not limited to:

e.    Depriving Rothman of opportunities to achieve performance goals and/or promotion based on his Jewish faith;

f.    Subjecting Rothman to an investigation, suspension, and/or discipline while at the same time failing to investigate, suspend, and/or discipline other employees involved in the same incident who are not, upon information and belief, Jewish;

g.    Terminating Rothman's employment because of his being Jewish; and/or

h.    Replacing him and/or assigning his duties to one or more non-Jewish employees.

162.    As a direct and proximate result of Vanguard's violation of Title VII, Rothman has sustained the injuries, damages and losses set forth in this Complaint.

163.    Rothman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Vanguard's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

164.    Vanguard's actions were undertaken with malice and/or reckless indifference to Rothman's rights under the circumstances and warrant the imposition of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Joseph Rothman respectfully requests that this Court enter judgment in his favor and against Defendant The Vanguard Group, Inc., awarding the following relief:

a.    declaring the actions and practices complained of herein to be a violation of the ADEA;

b.      declaring the actions and practices complained of herein to be a
        violation of Title VII;

c.      enjoining and restraining permanently the violations alleged herein;

d.      awarding damages to Rothman for the past and future economic
        losses that he has suffered;

e.      awarding compensatory damages to Rothman for past and future
        emotional upset, mental anguish, humiliation, loss of life's
        pleasures, and pain and suffering;

f.      awarding liquidated damages to Rothman pursuant to the ADEA;

g.      awarding Rothman punitive damages pursuant to Title VII;

h.      awarding Rothman the costs of this action, together with reasonable
        attorney's fees;

i.      awarding Rothman such other damages as are appropriate under the
        ADEA, Title VII, the PHRA, and federal and state law; and

j.      granting such other and further relief as this Court deems just and
        proper.

Respectfully submitted,
WEIR GREENBLATT PIERCE LLP

By: _____
    PATRICIA V. PIERCE, ESQUIRE
    Attorney Identification No. 23129
    MICHAEL P. BROADHURST, ESQUIRE
    Attorney Identification No. 80906
    The Widener Building, Suite 500
    1339 Chestnut Street
    Philadelphia, PA 19107
    Phone: (215) 665-8181
    Fax: (215) 665-8191
    ppierce@wgpllp.com
    mbroadhurst@wgpllp.com

Dated:  March 31, 2023

27

# EXHIBIT A



1339 CHESTNUT STREET • SUITE 500
PHILADELPHIA, PA 19107
(215) 665-8181
(215) 665-8464 FAX
WGPLLP.com

Patricia V. Pierce, Esquire
ppierce@wgpllp.com
(215) 665-8181

September 12, 2022

VIA ELECTRONIC MAIL
Equal Employment Opportunity Commission
Philadelphia District Office
801 Market Street
Suite 1300
Philadelphia, PA  19106-2515
PHILATTY@eeoc.gov

      Re:    Charge Filing – Joseph Rothman v. Vanguard Group, Inc.

Dear Sir or Madam:

      Please accept this letter as my formal entry of appearance on behalf on Charging Party, Joseph Rothman.

      Enclosed please find the following documents relating to a Charge of Discrimination to be filed on behalf of my client, Joseph Rothman: (1) a Charge of Discrimination, including Attachment A; (2) the Form to Request Dual-Filing with Pennsylvania Human Relations Commission; and (3) an Attorney Referred Charge Checklist.

      Please do not hesitate to contact me if you require any additional information.  Thank you for your assistance.

           Sincerely,

           WEIR GREENBLATT PIERCE LLP

           ***S/ Patricia V. Pierce***
           Patricia V. Pierce, Esquire

Enclosures
cc:    Joseph Rothman (via electronic mail w/ enclosures)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**
Attorney Referred Charge Checklist

| | |
|---|---|
| Your Name (Charging Party's Attorney's Name): Patricia V. Pierce; Michael P. Broadhurst; Joshua M. Baker | |
| Your e-mail address (Charging Party's Attorney's e-mail): ppierce@wgpllp.com; mbroadhurst@wgpllp.com; jbaker@wgpllp.com | |
| Your firm's name & address: Weir Greenblatt Pierce LLP; 1339 Chestnut St., Ste. 500, Philadelphia, PA 19107 | |

| | | |
|---|---|---|
| Date Submitted: | September 12, 2022 | **EEOC Office Use Only** <br> Date Received: |
| Location of Alleged Discrimination | Scottsdale, AZ; Malvern, PA | |
| Date(s) of Alleged Discrimination: | 2018 - March 22, 2022 | |
| Statute/s: | Basis (protected class/es): Age, Sex/Gender (male), Religion (Judaism) <br> Issue (alleged discriminatory action/s): Termination based on protected status. | |
| Charging Party | Name: Mr. Joseph Rothman <br> E-mail address: ███████ <br> National Origin:          Race:          Gender: M          DOB: 1/11/1965 | |
| Respondent | Name of Respondent: Vanguard Group, Inc. <br> Name of Respondent official who should receive the Charge: Courtney W. Griffin, Esq. <br> Address of Respondent official:  100 Vanguard Blvd., M37 <br> Malvern, PA 19355 <br> E-mail address of Respondent official:  courtney_griffin@vanguard.com; (484) 618-9718 | |

| | Yes | No |
|---|---|---|
| Is this an Amended Charge: | | X No |
| If yes, provide: Charge No. | | |
| Is this related to a previously filed Charge: | | X No |
| If yes, provide: Charge No. | | |
| Have you previously filed this matter with EEOC or another agency: | | X No |
| If yes, provide name of agency & date of filing: | | |
| Prefer Mediation | X Yes | Need more info. |
| Requesting Immediate Issuance of Right to Sue | Yes | X No |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before comple ing this form. | ☐ FEPA ☒ EEOC | |

Pennsylvania Human Relations Commission _____ and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs )* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mr. Joseph Rothman | ▇▇▇▇▇▇ | 1/11/1965 |

| Street Address | City, State and ZIP Code |
|---|---|
| 6320 E. Via Estrella Avenue | Scottsdale, AZ 85253 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Vanguard Group, Inc. | approx. 19,000 | (484) 618-9718 |

| Street Address | City, State and ZIP Code |
|---|---|
| 100 Vanguard Blvd. | Malvern, PA 19355 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es) )*

☐ RACE  ☐ COLOR  ☒ SEX  ☒ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below )*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest — Latest

2018 - March 22, 2022

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

Please refer to Attachment A.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

| September 12, 2022 | S/ Joseph Rothman | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
|---|---|---|
| Date | Charging Party Signature | |

<u>**Attachment "A" to EEOC Charge of Joseph Rothman**</u>
<u>**STATEMENT OF PARTICULARS**</u>

I, Joseph Rothman, bring this EEOC Charge to address the age-based discrimination that I have been subjected to by the Vanguard Group, Inc., ("Vanguard") which culminated in its unlawful termination of my employment on March 22, 2022 when I was fifty-seven (57) years old.

**Background:**

I joined Vanguard after having achieved substantial success working at Sumitomo Bank and Moody's Investors Service. I moved from New York to Pennsylvania in 2005 to work at Vanguard's headquarters in Malvern, Chester County. As a Senior Analyst, I covered general obligation financing all over the United States, corporate credit, project finance, and healthcare finance. Over the course of nearly seventeen years at Vanguard, I was consistently a top performer. My supervisors, such as Mike Griffin, former Head of Municipal Credit Research, and Ruth Levine, Principal and former Senior Municipal Credit Analyst, consistently referred to me as the "go to" person on an array of credit questions.

Vanguard management, including Greg Davis, Managing Director and Chief Investment Officer, and other senior leaders, recognized my skills, business acumen, and leadership. On that basis and recognizing the value that I had contributed up to that point, Vanguard asked me to take a position in its new Arizona office to grow the municipal credit department and to train and mentor younger analysts. I accepted the opportunity to continue my career growth with Vanguard and in 2017, I uprooted my family again and moved to Arizona.

I have always been driven to succeed and have found my work exciting and fulfilling. I have always approached my role with a strong sense of fiduciary duty and candor toward the Vanguard investor and have never been bonus driven. Until the events immediately preceding Vanguard's decision to terminate my employment, reviews of my performance were all positive and, when I did receive critical feedback, I responded constructively. Until recent events, I had not been the subject of employment discipline by Vanguard. Based on my experience and the opportunities that I had with Vanguard, I had every reason to expect that I would work at Vanguard until retirement.

Regrettably, Vanguard management did not reciprocate the good will and dedication I gave to Vanguard's investors.

Not long after I moved to Arizona, Vanguard installed two younger, less experienced individuals as my supervisors, Nathan Will and David Thorkelson. Mr. Will came to the Municipal Credit group from Vanguard's legal department without meaningful background in municipal credit analysis. Mr. Thorkelson had no prior experience at Vanguard. Both Mr. Will and Mr. Thorkelson are substantially younger (12-15 years) than me.

As soon as Mr. Will became my supervisor, his conduct caused me to feel that I needed to watch my back, that he was gunning for me, and that I had been taken "out of the loop" of developments in my group. Indeed, in 2018, at my first mid-year review after he was made my

1

supervisor, Mr. Will rated my performance "off-track," a rating that no previous supervisor had ever given me. By the end of the year, however, I earned a "fully successful" rating.

In my first meeting with Mr. Thorkelson after he was named my direct supervisor, Mr. Thorkelson told me that it was "weird" and that he felt "awkward" being made my manager given my seniority and expertise in the area of municipal credit. As a dedicated professional, I responded that I was "there to make the relationship work and to add value." However, from that point forward, Mr. Thorkelson simply did not engage with me and did not actively manage me.

Despite having a subordinate place in the formal reporting structure and the fact that I had no official supervisory title, Vanguard management referred to me as a "team lead." Members of the team recognized my seniority by seeking to access my expertise but also referred to my age, from time to time referring to me as "Daddy." Yet Vanguard gave me no support or guidance in addressing such challenging interactions with junior team members. When I asked Mr. Thorkelson to take part in meetings or conference calls, he did not respond or did not take part. When I asked Mr. Will for assistance dealing with issues that arose with more junior analysts in the group, he instructed me to "deal with it," to "make sure nobody complains," and "don't think you can go speak to Greg Davis and fix it."

Mr. Will's hostility toward me increased after a team meeting which took place by Zoom in mid-2020 while Vanguard was operating on a remote basis in response to the COVID-19 pandemic. After a statement by Mr. Will that team members should not misunderstand if other team members did not respond immediately to emails because everyone should be taking appropriate time for self-care, I responded to the effect that, as professionals, those on the call understood prioritizing responses to emails. Although I did not intend to offend, Mr. Will took offense to my remark and spoke about his offense to others, starting a campaign against me. I apologized to him, but it did not appear he accepted my apology.

Several months later, while visiting Vanguard's Malvern offices in November 2021, I sought out Mr. Will and Mr. Thorkelson for in-person, informal meetings in advance of the finalizing of 2021 performance reviews. In that meeting, Mr. Will told me that I was the "worst performing analyst" in the department. I was shocked by this and asked what had made him say it. Mr. Will answered that I was "firing on two cylinders" while two younger female analysts (Ms. Sim Singh and Ms. Molly Bordeaux) "are firing on five." I understood Mr. Will's comment as referring to my age since both Ms. Singh and Ms. Bordeaux are substantially younger than me, in their twenties or thirties. In this same meeting, I asked for details on what caused Mr. Will to conclude this but he would not supply any facts supporting the statement. I also asked what I could do to meet Mr. Will's expectations and he responded, "all I need from you is data that I can give to Paul [Malloy] so he can look good in front of Sarah [Devereux]," Global Head of Fixed Income. Mr. Will provided no other guidance. Mr. Will also told me that I had not met a performance goal dealing with participation in private placements. In fact, Mr. Will had not included me in collaborations on these proposed private placements, cutting off any opportunity I might have to meet goals in that area. I told Mr. Will that he had not been included me in discussions on over 15 private placements that the group had considered and asked him why I had not been brought into these discussions. Mr. Will's only response was that I could only "ask myself why." I understood Mr. Will's comments to be referring to his bias against me, which was age based, given that Mr.

Will had cut me out of certain discussions in order to prevent me from being in a position to succeed. Mr. Will's bias against me based on my age directly impacted my compensation as his review resulted in a reduced bonus just as Vanguard enjoyed record profits that year.

**The March 3, 2022 Interaction and Vanguard's So-called Investigation:**

Following an interaction that took place on or about March 3, 2022 between myself, Isaac Solbach, a Senior Associate in Vanguard's Emerging Leadership Development Program, and Molly Bordeaux, a Senior Credit Research Analyst, Vanguard launched an "investigation" into my employment with the company. Rather than engaging in an even-handed investigation of the interaction, Vanguard seized on an innocuous encounter as an excuse to justify terminating my employment.

Toward the end of the day on Thursday, March 3, 2022, as I was preparing to leave for the day, I saw Mr. Solbach and spoke with him regarding a project that he had been involved with under my guidance. Although Mr. Solbach's rotation in the Municipal Credit group was ending, we had not yet spoken about work that he had done. Although neither I nor Mr. Solbach addressed any statement to Ms. Bordeaux, she inserted herself into the conversation and said, "Well, Joe, you haven't been around all week!" I responded that I had been in the office, that I had been speaking to Mr. Solbach, and that he "can speak for himself." I then suggested several alternatives to Mr. Solbach about when we could meet the next day after the team morning meeting, including possibly meeting outside the office. Ms. Bordeaux again interrupted the discussion between me and Mr. Solbach and said "You can't do that. You need approvals from management for that." I then told Mr. Solbach that I did not realize that, and we agreed that we would meet the next morning in the office.

Later, as I left for the day, I encountered Mr. Solbach in the parking lot outside the office and spoke with him again. I told Mr. Solbach that I was sorry that he was "caught in the middle" and then left for the day.

The next day, I went to Vanguard's offices where John Carbone, Vanguard Principal and Arizona site leader, sought me out and instructed me not to speak with Mr. Solbach or other interns again. I asked Mr. Carbone whether he had spoken with Ms. Bordeaux about the exchange that took place the day before. Mr. Carbone responded that he "didn't want to" but he had spoken with Ms. Bordeaux and Mr. Solbach. When I asked Mr. Carbone if he wanted to hear my account of what took place, he said "No" and shut the conversation down. I complied with Mr. Carbone's instruction.

The following Monday, March 7, 2022, when I went to the office, Mr. Will contacted me, told me that he was aware of the incident and instructed me not to return to the office but to go home, and that Human Resources had started an investigation. Again, I complied.

Thereafter, Vanguard provided me with little or no information about what complaint or issue was being investigated or why. Instead, I was denied information about the investigation.[1] I was first contacted about this so-called investigation by telephone on March 10, 2022, when Steven

---

[1] I also requested a copy of my personnel file, but Vanguard denied this request out of hand.

McCord of Vanguard Human Resources asked me a few questions. In a second interview on March 11, 2022, Mr. McCord confronted me with a surveillance video that had no audio in which I was seen speaking with Mr. Solbach in the parking lot outside the office. Mr. McCord asked me about the contents of the conversation, and I responded that I told Mr. Solbach that I was sorry that he had been placed in the middle of a situation involving me and Ms. Bordeaux.

Despite the fact that I cooperated with Vanguard's investigation, its purpose and scope remain unclear. While I was barred from coming to the office, I learned that Vanguard HR had gathered statements from other employees, individuals who were not involved with or present for the exchange that took place on March 3, 2022. Other Vanguard employees have stated that only select individuals were interviewed about me because management was "going after" me and that those employees were told not to speak with me because I would be suing Vanguard. Thus, it appears Vanguard reached its decision to terminate me well before completing its review of the incident.

Without ever explaining the charges against me or the subject of the investigation so that I could defend myself, on March 22, 2022, Mr. McCord and Mr. Will called me. During that call, Mr. Will read a prepared statement to me and informed me that Vanguard had terminated my employment immediately due to an alleged "breach of policy." I asked what I had done, and Mr. McCord responded, "like we said, you broke policy." I asked again what policy I had allegedly breached, and Mr. McCord responded that it was a violation of Vanguard policy to invite another employee to meet at my home. I later asked for a copy of the policy that I had allegedly violated and that I be allowed to review my personnel file but Mr. McCord refused to provide a copy of the policy or allow me to review my complete personnel file. Instead, he claimed that my "separation was the result of [my] behavior which was found to be in violation of Vanguard's Professional Conduct Policy and inconsistent with its Fair Treatment Policy."

**Vanguard's Liability / Causes of Action:**

I suffered age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 626-634, and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* The explanation Vanguard gave for terminating my employment is pretextual.

In fact, it appears that Vanguard's treatment of me, a respected, trusted, "go to", and top-performing employee who had not been subject to any prior disciplinary process, including the termination of my employment resulted from unlawful bias based on my age. In addition, Vanguard passed me over for promotions and meaningful growth opportunities and treated younger analysts differently, including but not limited to, Ms. Bordeaux and Ms. Singh. Mr. Will, my younger and less qualified supervisor, negatively reviewed my performance because of my age and alleged inability to perform to the level of younger colleagues which substantially reduced my compensation and bonuses. As a result of my age, Vanguard terminated my employment without warning and without any meaningful effort to counsel or discipline me (assuming I had done something wrong, which I did not do). Although Vanguard's age-based bias against me is clear, I

am not ruling out other unlawful bases for its treatment of me, including my gender and my Orthodox Jewish faith.[2]

Vanguard will have a tough time defending its treatment of me in light of how it treated less-qualified, less-experienced, and under-performing analysts. Given the history of my performance, the absence of negative performance reviews, and Vanguard's difficulty in articulating a legal rationale for terminating my employment, a reasonable person could easily conclude that Vanguard's explanation for its actions is pretext.

Other circumstances surrounding Vanguard's treatment of me also indicate that the stated reason for my termination is pretextual. These circumstances include, in no particular order, the fact that: Vanguard made little effort to identify my alleged offense to me or engage me in its review of the incident in any meaningful way; the "investigation" conducted by Vanguard focused on individuals who were not involved in the alleged policy violation; and since firing me, Vanguard has referred to me as "retired" despite the fact that my separation from employment with Vanguard was entirely against my will and that Vanguard has failed to inform me of the retirement benefits and other options/services available to me. In addition, a younger employee who was involved in the event that allegedly led to my termination and who acted unprofessionally and inappropriately (Ms. Bordeaux) was not investigated and/or disciplined in any way.

**Damages:**

Given the significant uncertainty in the economy at present, my age, and the difficulties presented by the fact that I must acknowledge that Vanguard fired me after seventeen years of successful service, I have had a hard time finding suitable employment offering pay and benefits that compares to what I earned at Vanguard. When I find another job, it will pay much less than what I had been earning and likely will not have similar benefits.

As a result of Vanguard's bias, I have suffered financial losses in the millions of dollars, representing front pay, health and disability insurance, and substantial losses in retirement benefits. My professional standing has also been significantly damaged through no fault of my own.

Other types of damages, such as emotional distress, punitive damages, and attorneys' fees are also available under the circumstances presented.

*S/ Joseph Rothman*
Joseph Rothman, Complainant

September 12, 2022

---

[2] As I reported to my superiors, in discussing my choice of living arrangements in order to be within walking distance of my family's synagogue, a senior colleague responded "So, you're still doing the 'Jewwy' stuff?"

**Information For Complainants & Election Option**
**To Dual File With The**
**Pennsylvania Human Relations Commission**

_____ Joseph Rothman ᵥ. Vanguard Group, Inc. _____

EEOC Charge No.   _____

You have the right to file this charge of discrimination with the Pennsylvania Human Relations Commission (PHCR) under the Pennsylvania Human Relations Act.  Filing your charge with the PHRC protects your state rights, especially since there may be circumstances in which state and federal laws and procedures vary in manner which could affect the outcome of your case.

Complaints filed with PHRC must be filed within 180 days of the act(s) which you believe are unlawful discrimination.  If PHRC determines that your PHRC complaint is untimely, it will be dismissed.

If you want your charge filed with PHRC, including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with PHRC.  You have chosen EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept EEOC's finding.  If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to file a request for preliminary hearing with PHRC

Since you have chosen to file your charge first with EEOC, making it the primary investigatory agency, the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year of filing with PHRC, you have the right to file your complaint in state court.  PHRC will inform you of these rights and obligations at that time.

[**Sign and date appropriate request below**]

I want my charge filed with PHRC.  I hereby incorporate this form and the verification below into the attached EEOC complaint form and file it as my PHRC complaint.  I request EEOC to transmit it to PHRC.

*I understand that false statements in this complaint are made subject to the penalties of 18 Pa.C.S. §4909, relating to unsworn falsification to authorities*.

_S/ Joseph Rothman_____   Sept. 12, 2022
Signature and Date

*I do not want my charge dual filed with PHRC.*

_____
Signature and Date

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Joseph Rothman**<br>**6320 East Via Estrella Avenue**<br>**Scottsdale, AZ 85253** | From: **Philadelphia District Office**<br>**801 Market St, Suite 1000**<br>**Philadelphia, PA 19107** |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2022-06975** | **Legal,**<br>**Legal Unit** | **(267) 589-9707** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

    Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

    The EEOC is terminating its processing of this charge.

*Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** \*of your receipt of this Notice.\*  Otherwise, your right to sue based on the above-numbered charge will be lost.*

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By: Karen McDonough
10/06/2022

Enclosures(s)

**Karen McDonough**
**Deputy District Director**

cc:  **Courtney W Griffin**
    **Vanguard Group**
    **100 Vanguard Blvd, M37**
    **Malvern, PA 19355**

    **Patricia V Pierce**
    **Weir, Greenblatt, Pierce, LLP**
    **1339 Chestnut, Ste. 500**
    **Philadelphia, PA 19107**

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** – **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** – **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** – **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** – **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

# EXHIBIT B

EEOC Form 161-B (01/2022)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Joseph Rothman**<br>**6320 East Via Estrella Avenue**<br>**Scottsdale, AZ 85253** | From: | **Philadelphia District Office**<br>**801 Market St, Suite 1000**<br>**Philadelphia, PA 19107** |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2022-06975** | **Legal,**<br>**Legal Unit** | **(267) 589-9707** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

    Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

    The EEOC is terminating its processing of this charge.

*Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** *of your receipt of this Notice.*  Otherwise, your right to sue based on the above-numbered charge will be lost.*

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By: Karen McDonough
10/06/2022

Enclosures(s)

**Karen McDonough**
**Deputy District Director**

cc:   **Courtney W Griffin**
     **Vanguard Group**
     **100 Vanguard Blvd, M37**
     **Malvern, PA 19355**

     **Patricia V Pierce**
     **Weir, Greenblatt, Pierce, LLP**
     **1339 Chestnut, Ste. 500**
     **Philadelphia, PA 19107**

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law.</u>*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    –    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    –    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    –    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    –    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***